COMMONWEALTH *vs.* LARRY MICHEL.

Essex.   May 7, 1980. — September 4, 1980.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Practice, Criminal,* Assistance of counsel.   *Conflict of Interest.   Constitutional Law,* Assistance of counsel, Waiver of constitutional rights.   *Waiver.*

A defendant in a criminal case was entitled to a new trial on the grounds of ineffective assistance of counsel where a codefendant with conflicting interests, who became the Commonwealth's main witness against the defendant during the trial, was represented by a law associate of the defendant's trial counsel and in unrelated pending matters by the defendant's own attorney and where the defendant's attorney also represented the defendant's wife in a divorce action which was pending at the time of the criminal trial.   [448-456]

MOTION for a new trial filed in the Superior Court on December 19, 1977.

The proceeding was heard by *Bennett, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Daniel E. Callahan* for the defendant.

*Lila Heideman,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J.   After the defendant's convictions for robbery and mayhem were affirmed, see *Commonwealth* v. *Michel,* 367 Mass. 454 (1975), he brought a motion for a new trial alleging that he was denied the effective assistance of counsel at his jury waived trial because of pervasive conflicts of interest on the part of his trial counsel.   In setting forth his claim Michel focuses primarily on the fact that a codefendant with conflicting interests, who became the Commonwealth's main witness against him during the trial,

was represented in the present cases by a law associate of his
trial counsel and in other pending matters by Michel's own
attorney. Michel adds that his trial counsel, acting as an at-
torney for Michel's wife in divorce proceedings, had him
served with a libel for divorce during the criminal trial.
Michel asserts that this record indicates that at no time dur-
ing his trial did he have the undivided loyalty of counsel.
We agree. We reverse and remand for a new trial.

We recount the facts concerning the conflicts of interest
established by the motion for new trial. On March 19,
1972, one William Cole was robbed and savagely beaten.
Twelve days later, Walter D. Coyne, III, in the presence of
his attorney, Mr. Michael Gorham, made a statement to
police which exculpated Coyne[1] and inculpated Michel and
the Dietrich brothers, Ernest and Dennis. At the time
Coyne talked with police he indicated he would cooperate
with them on these crimes. Coyne, at that time, had three
serious charges pending against him in the same court, and
on two of those charges he was represented by Mr. Anthony
DiFruscia,[2] a law associate of Mr. Gorham or Mr. Gorham's
law partner.

At a probable cause hearing held in connection with these
crimes, Mr. DiFruscia represented Michel, and the com-
plaints against Michel were dismissed. Coyne, represented
by Mr. Gorham, was bound over to the grand jury as were
the two Dietrich brothers. In September, 1972, the four
men were charged by the grand jury with mayhem and rob-
bery. In December, Mr. DiFruscia told Michel that the
grand jury had charged Michel as well as Coyne and the
Dietrichs with the offenses against Cole. Mr. DiFruscia ad-
vised Michel to request his appointment in the Superior
Court since he had handled the matter in a District Court.

---

[1] In his statement, Coyne claimed he was present but did not participate
in the crimes.

[2] Mr. DiFruscia had entered an appearance for Coyne on charges of
assault with intent to rape a child under sixteen, and assault and battery.
An attorney for the Massachusetts Defenders Committee had entered an
appearance on a charge of rape.

Mr. DiFruscia added that he was representing Michel's wife in a divorce proceeding. At this time Michel was incarcerated on unrelated offenses. Michel did request a Superior Court judge to appoint Mr. DiFruscia to represent him, and the judge did so.

Coyne, meanwhile continued to be represented by Mr. Gorham on the robbery and mayhem charges. In addition, at all times here relevant, Coyne was represented by Mr. DiFruscia on two of the three pending felony charges against him. See note 2, *supra.* Prior to their joint jury waived trial Michel and Coyne signed appearance slips on which they wrote they had no objection to their representation by members of the same firm.

In his opening statement, the assistant district attorney indicated that in addition to Cole's testimony, he intended to offer Coyne's statement in evidence. Cole testified as to details of the attack on him but did not identify any of the four defendants as the persons responsible for that attack. The judge held him on a presumption of perjury. G. L. c. 268, § 4. The police officer to whom Coyne had given a statement testified to the conversation he had with Coyne twelve days after the crime. After objection by all defense counsel, the judge ruled that the witness "omit any proper names" in recounting Coyne's statement.[3]

On cross-examination, Coyne's attorney elicited testimony from the officer that Coyne had stated that he did not participate in the beating and, in fact, had attempted to help the victim. The thrust of Mr. Gorham's cross-examination of the officer was to disassociate Coyne from his three codefendants. Coyne's attorney also referred to the description of the car that Coyne had given to the police, which, in fact, matched Michel's car.

After completion of the police testimony, the Commonwealth moved to nol-pros the two indictments against

---

[3] The judge correctly observed that had a motion to sever been made at the outset of trial, there would have been no need to redact the statement. *Bruton* v. *United States,* 391 U.S. 123 (1968).

Coyne. Mr. Gorham objected on Coyne's behalf, and the judge entered verdicts of not guilty on both indictments. See *Commonwealth* v. *Hart,* 149 Mass. 7, 8-9 (1889); *Commonwealth* v. *Dascalakis,* 246 Mass. 12, 19 (1923). See also *Commonwealth* v. *Dietrich, post* 458 (1980).

Coyne was the next witness called. At this point, Attorney Gorham withdrew from the case at the judge's suggestion and new counsel was then appointed for Coyne. The Commonwealth filed a statement of its intent not to prosecute Coyne for any crimes arising from his testimony except for perjury.[4] Coyne declined to answer questions and was declared a hostile witness. His testimony was interrupted by a brief recess, after which Mr. DiFruscia moved to withdraw his appearances on the indictments still pending against Coyne (see note 2, *supra*). The prosecutor then inquired whether an arrangement had been reached among Coyne, the Commonwealth, and Coyne's new attorney. After Coyne replied yes, he began to testify for the Commonwealth as to the events of March 19. Coyne then implicated Michel in the crimes against Cole. Mr. DiFruscia did not cross-examine Coyne. However, other counsel cross-examined Coyne. The cross-examination by other counsel revealed that the Commonwealth told Coyne that, if he did not testify, the district attorney would prosecute the other pending charges and if Coyne were convicted he would recommend from fifteen-to-twenty year sentences.

---

[4] Since Coyne had already been acquitted of offenses arising out of the attack on Cole it is unclear what effect the Commonwealth believed its statement would have. See, e.g., *Turner* v. *Arkansas,* 407 U.S. 366 (1972); *Ashe* v. *Swenson,* 397 U.S. 436 (1970). The parties refer to this statement as a "grant of immunity" even though it was filed after Coyne had been acquitted by the trial judge. We leave open the question whether G. L. c. 233, § 20C, et seq., is the exclusive procedure by which a witness may be granted immunity. See *Commonwealth* v. *Simpson,* 370 Mass. 119, 121 & n.1 (1976). If the statement is viewed as a promise, the Commonwealth is bound to keep its word. *Commonwealth* v. *Benton,* 356 Mass. 447 (1969).

An assistant district attorney also testified that, if Coyne's testimony were consistent with the substance of Coyne's pretrial statement to the police, the district attorney would enter a "disclaimer of prosecution" as to the "morals charges" (see note 2, *supra*). Furthermore, the Commonwealth agreed that no prosecution would be based on Coyne's testimony except for perjury, and that the Commonwealth would not oppose a request for parole on the sentences which Coyne was then serving. The prosecutor added that, if Coyne did not cooperate, the previous recommendation of from eighteen to twenty years in the "morals cases" would stand.[5] As a result, the other pending charges against Coyne were nol prossed after he testified. On the day Coyne testified Mr. DiFruscia withdrew his appearance and a nolle prosequi was entered on the docket of each of these pending charges.[6]

A conflict of interest does not arise solely because there is joint representation. *Commonwealth* v. *Soffen,* 377 Mass. 433, 438 (1979). *Commonwealth* v. *Davis,* 376 Mass. 777, 781 (1978). Rather, a conflict exists whenever there is tension between the interests of one client of an attorney and those of another. See S.J.C. rule 3:22,[7] DR 5-105, 359

---

[5] There is an obvious discrepancy between Coyne and the district attorney's office as to what the recommendation would be. See 450, *supra.* However, Coyne testified that he knew there would be a "big hit" (heavy sentences) if he were convicted, unless he cooperated.

[6] The transcript indicates that, for two or three days prior to Coyne's testimony, Coyne was negotiating with the prosecutor concerning his pending charges. During this period, Mr. DiFruscia was still the attorney of record for Coyne on two of the charges. Moreover, two days before Coyne was acquitted, Mr. Gorham filed motions for speedy trial on the three indictments then pending against Coyne. See note 2, *supra.* When Mr. Gorham filed the three motions, Mr. DiFruscia had not withdrawn his appearance.

[7] In citing rule 3:22 and the A.B.A. Code of Professional Responsibility we only refer to the applicable portions of those standards in effect at the time of trial (January, 1973).

Mass. 796, 816 (1972).[8] In cases of joint representation "[t]here is an actual, relevant conflict of interests if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action." *Cuyler* v. *Sullivan*, 446 U.S. 335, 356 n.3 (1980) (Marshall, J., dissenting). A.B.A. Canons of Professional Ethics, Canon 6 (1965) ("[A] lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend that which duty to another client requires him to oppose").

The Commonwealth asserts that the record reveals only a potential conflict of interest and, therefore, Michel must prove actual prejudice. The Commonwealth then carefully reviews the trial record in an effort to establish that Michel was not prejudiced by Mr. DiFruscia's potential conflicts. The Commonwealth suggests that since the defendants had adopted a "united we stand, divided we fall" defense, there was no actual conflict at the beginning of trial, and the withdrawal of Mr. Gorham after Coyne's acquittal eliminated any actual conflict arising during trial. The Commonwealth further claims that Mr. DiFruscia's appearance in the other pending charges did not give rise to any actual conflict since Mr. DiFruscia did not act as Coyne's attorney at trial, and he withdrew his appearance prior to the time

---

[8] "DR 5-105 Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105 (C).

"(C) In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

Coyne began to testify fully. The Commonwealth concludes that Michel's claim as to Mr. DiFruscia's joint and dual representation did not create an actual conflict, and in the absence of actual prejudice shown on the record, Michel's claim is without merit. We do not agree.

The record suggests that at the beginning of trial Mr. DiFruscia had two rather obvious conflicts: (1) Coyne had already given a statement to the police in the presence of Mr. DiFruscia's law associate shifting blame from himself to Michel and the Dietrichs; and (2) Mr. DiFruscia knew Coyne had felony indictments hanging over his (Coyne's) head, and that Coyne might, if he cooperated with the police and with the prosecutor, secure favorable disposition in those cases. See *Commonwealth* v. *Leslie*, 376 Mass. 647, 653 (1978), cert. denied, 441 U.S. 910 (1979).

The nub of counsel's conflict was that if Coyne did not testify he would be prosecuted on the pending charges and, if convicted, treated harshly. If Coyne did testify, Michel would be convicted of serious offenses involving savage brutality. Counsel knew or should have known that the prosecutor might use Coyne's pending charges as leverage to secure Coyne's testimony. Since the choice was Coyne's, it was reasonably foreseeable by counsel that Coyne would testify against Michel. These facts indicate an actual conflict of interest between Michel and Coyne while they were jointly represented by members of the same firm.

"A defendant is entitled to the untrammeled and unimpaired assistance of counsel free of any conflict of interest and unrestrained by commitments to others." *Commonwealth* v. *Davis*, 376 Mass. 777, 780-781 (1978). *Glasser* v. *United States*, 315 U.S. 60, 76 (1942). "Once a genuine conflict is shown, there is no additional requirement that prejudice be proved." *Commonwealth* v. *Cobb*, 379 Mass. 456, 459 (1980), quoting from *Commonwealth* v. *Soffen*, 377 Mass. 433, 437 (1979). See *Commonwealth* v. *Rondeau*, 378 Mass. 408, 415 (1979); *Commonwealth* v. *Bolduc*, 375 Mass. 530 (1978); *Commonwealth* v. *Adams*, 374 Mass. 722 (1978). See also *Holloway* v. *Arkansas*, 435

U.S. 475, 489-491 (1978). Cf. *Cuyler* v. *Sullivan*, 446 U.S. 335 (1980).[9] Since counsel had an actual conflict, we need not search the record to determine whether the defendant's representation was prejudiced by constraints arising from the conflict.[10] See *United States* v. *Jeffers*, 520 F.2d 1256 (7th Cir. 1975), cert. denied, 423 U.S. 1066 (1976).

We do not regard counsel's attempt to terminate his relationship with Coyne on the fifth day of Michel's trial as curing the conflicts which arose from Mr. DiFruscia's simultaneous representation of Michel and Coyne. For all practical purposes, the relationship between Michel's counsel and the witness is tantamount to one continuing throughout the defendant's trial. Cases in which courts have found no conflict arising from dual representation have relied on termination of the relationship prior to or at the date of trial. Compare *Commonwealth* v. *Cobb*, 379 Mass. 456 (1980), with *Commonwealth* v. *Soffen*, 377 Mass. 433, 437-438 (1979); *Commonwealth* v. *Smith*, 362 Mass. 782, 784 (1973); *United States* v. *Donatelli*, 484 F.2d 505, 507 (1st

---

[9] We do not read *Cuyler* v. *Sullivan*, 446 U.S. 335 (1980), as establishing a different standard. As we read the case an actual conflict arising from joint representation does not require evidence of material prejudice. However, a showing of the mere possibility of a conflict is insufficient without some showing of material prejudice. We note that the probability of counsel's being hampered by conflicting loyalties was reduced in *Cuyler* by the fact that the trials of the three defendants were separate. See 444 U.S. at 347-348 (1980).

[10] Mr. DiFruscia neither cross-examined Coyne nor did he argue Coyne's credibility or lack thereof in his summation. The Commonwealth suggests that Mr. DiFruscia's tactics were based on valid considerations since Coyne's testimony as to the participation in the crimes of the three other defendants was least inculpatory of Michel. This argument misses the point. Decisions not to cross-examine a witness or not to argue a particular matter to the fact finder may well be legitimate tactical decisions if made by independent counsel. However, such decisions if made by counsel with divided loyalties are suspect because it is not possible to determine reliably to what extent the decisions were based on valid strategic considerations and to what extent the decisions were the result of impermissible considerations of the interests of other clients.

Cir. 1973).[11] As thus viewed, these facts also indicate that Michel was denied his "important right to an attorney who is loyal solely to him," *Commonwealth* v. *Wright*, 376 Mass. 725, 730 (1978), and has therefore been denied the effective assistance of counsel guaranteed to him by the Federal and State Constitutions.

Finally, we comment briefly on the last conflict which appears in this record. Mr. DiFruscia represented the defendant's wife in a divorce action grounded on cruel and abusive treatment. The divorce was initiated on January 5, 1973, after the probable cause hearing, but prior to Mr. DiFruscia's appointment as the defendant's attorney in the Superior Court charges. Mr. DiFruscia moved to amend the libel for divorce so as to include the defendant's conviction as an additional ground for divorce. The motion was denied.[12] The divorce was granted while Mr. DiFruscia was representing the defendant on appeal. Mr. DiFruscia's appearance for Michel's wife in the divorce action permits the inference that he had an interest in Michel's being convicted of these offenses, an interest obviously adverse to that of the defendant. See *Commonwealth* v. *Davis*, 376 Mass. 777, 782 (1978); *Commonwealth* v. *Leslie*, 376 Mass. 647, 651 (1978); *United States* v. *DiCarlo*, 575 F.2d 952, 957 (1st Cir.), cert. denied, 439 U.S. 834 (1978); *United States* v.

---

[11] See *People* v. *Johnson*, 46 Ill. 2d 266, 268 (1970): "While it may be true, technically, that the attorney-client relationship was severed, the fact remains that one of the [trial counsel's] clients went free and testified against the defendant who was sentenced to the penitentiary. Under these circumstances it cannot be said that defendant received the undivided allegiance of his counsel."

[12] Trial counsel did amend the complaint to request custody and support of a child born in December, 1973, although trial counsel knew the defendant had been incarcerated continuously since December, 1972.

There was conflicting evidence as to whether the defendant acquiesced in the divorce. In his affidavit supporting his motion for a new trial, the defendant stated that he "always intended and did attempt to contest [his] wife's divorce complaint." Attorney DiFruscia contended that when he informed the defendant about the divorce action and his representation of the defendant's wife during his visit in December, 1972, the defendant indicated that he also wanted a divorce.

*Hurt,* 543 F.2d 162 (D.C. Cir. 1976). Mr. DiFruscia's attempt to capitalize on the negative outcome in the defendant's criminal cases, a move apparently undertaken to fortify the defendant's wife's chances of prevailing in the divorce action, indicates a total lack of sensitivity to this conflict. Such conduct does not demonstrate the undivided loyalty which Mr. DiFruscia owed Michel in these cases.

We add that the allegiance which an attorney owes a client is worthy of much more scrupulous attention than was demonstrated by defense counsel in this case.[13] The duty of counsel is to represent a "client zealously within the bounds of the law,"[14] to treat all persons involved in the legal process with consideration,[15] and to uphold the integrity and honor of the legal profession.[16] Counsel's conduct in this case falls measurably below what is expected of members of the Massachusetts Bar.[17]

---

[13] See A.B.A. Standards Relating to the Defense Function § 3.5 (a) and (b) (Approved Draft 1971): "(a) At the earliest feasible opportunity defense counsel should disclose to the defendant any interest in or connection with the case or any other matter that might be relevant to the defendant's selection of a lawyer to represent him. (b) Except for preliminary matters such as initial hearings or applications for bail, a lawyer or lawyers who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants may conflict with the duty to another. The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation."

[14] A.B.A. Code of Professional Responsibility, Canon 7 (1969). Rule 3:22 of the Rules of the Supreme Judicial Court, 359 Mass. 787, 818 (1971).

[15] A.B.A. Code of Professional Responsibility, EC 7-10 (1969).

[16] A.B.A. Code of Professional Responsibility, EC 9-6 (1969).

[17] Although the ethical considerations appearing in the American Bar Association "Code of Professional Responsibility and Canons of Judicial Ethics" were not adopted by this court in 1972, we stated that "those Ethical Considerations form a body of principles upon which the Canons of Ethics and Disciplinary Rules . . . are to be interpreted." 359 Mass. at 797.

We briefly address the question whether the defendant may have waived his right to representation by an attorney free of any conflict of interest by a statement on trial counsel's appearance slip, agreeing to joint representation.[18] Nothing in that statement indicates that the agreement to be represented jointly with Coyne by members of the same law firm was based on full disclosure of the actual and potential conflicts inherent in this situation. There is, therefore, neither a knowing and intelligent waiver of a constitutional right on this record, see *Johnson* v. *Zerbst,* 304 U.S. 458, 465 (1938), nor evidence that the statement was signed with "awareness of the relevant circumstances and likely consequences." *Brady* v. *United States,* 397 U.S. 742, 748 (1970).

In sum, this case presents an egregious breach of trial counsel's duty to provide his client with effective and loyal representation. Thus a new trial is required and the order denying the defendant's motion for a new trial must be reversed.

*So ordered.*

---

[18] *Commonwealth* v. *Davis,* 376 Mass. 777 (1978), which requires an affirmative inquiry by the trial judge as to joint representation, is prospective only.